**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                                    )
**COMPOSITE COMPANY, INC.,**                        )
**individually and on behalf of others**            )
**similarly situated,**                              )
                                                    )        **Civil Action No.**
        **Plaintiffs,**                              )        **13-10491-FDS**
                                                    )
**v.**                                               )
                                                    )
**AMERICAN INTERNATIONAL GROUP,**                    )
**INC.; CHARTIS, INC.; and AMERICAN**                )
**HOME ASSURANCE CO.,**                              )
                                                    )
        **Defendants.**                              )
_____)

**MEMORANDUM AND ORDER ON DEFENDANTS'**
**MOTIONS TO DISMISS AND TO STRIKE AND PLAINTIFF'S MOTION TO REMAND**

        This is an action based on the alleged failure of defendants to revise underwriting figures

and adjust reserves for workers' compensation insurance policies.  Defendant American Home

Assurance Company ("AHAC") is the nominal issuer of the policies at issue.  According to the

complaint, the policies were actually administered by holding company defendants Chartis, Inc.

and American International Group, Inc. ("AIG").  Plaintiff Composite Company, Inc. brought

suit in state court on behalf of itself and a class of other similarly situated companies, alleging

breach of contract, breach of the implied covenant of good faith and fair dealing, unjust

enrichment, and violation of Mass. Gen. Laws, ch. 93A.  The suit was subsequently removed to

this Court.

        Defendants AIG and Chartis have moved to dismiss the complaint pursuant to Fed. R.

Civ. P. 12(b)(2) for lack of personal jurisdiction.  Defendant AHAC has moved pursuant to Fed.

R. Civ. P. 12(b)(6) to dismiss for failure to state a claim and pursuant to Fed. R. Civ. P. 12(f) to

strike plaintiff's claim for exemplary damages.  Plaintiff Composite has cross-moved to remand the action to state court.

For the reasons set forth below, defendants' motion to dismiss for lack of personal jurisdiction will be denied; defendant's motion to dismiss for failure to state a claim will be granted in part and denied in part; defendants' motion to strike will be granted in part and denied in part; and plaintiff's motion to remand will be denied.

## I.   <u>Background</u>

### A.   <u>Legal Framework</u>

The National Council on Compensation Insurance ("NCCI") and the Massachusetts Workers' Compensation Rating and Inspection Bureau ("WCRIB"), pursuant to Mass. Gen. Laws ch. 152, § 52C, serve as the workers' compensation statistical agents and rating organizations for Massachusetts, depending on whether the workers' compensation risk is interstate or intrastate, respectively.

A policyholder's annual workers' compensation insurance premium is determined by finding the corresponding "manual premium," which is calculated using the "manual rate" (that is, rates obtained from a manual) uniformly applicable to a particular job classification (for example, clerical or construction work), and adjusting that rate based on a policyholder's specific experience modifier.  The manual rate itself has two components based on data collected by NCCI and WCRIB—"loss costs" and an "expense component."  *See* Mass. Gen.  Laws ch. 152, § 52C(f).

Under Massachusetts law, the WCRIB determines both loss costs and the expense component for Massachusetts policyholders.  *See id.*  Once the manual premium for a particular

policy is calculated, it is adjusted by factors specific to the policyholder, including its experience

modifier, which is derived from the policyholder's past-loss history.  Accordingly, a claim made

under a policy, and any subsequent third-party reimbursement for that claim, has an impact on

the experience modifier and premium due under policies for future years.

The WCRIB and NCCI manage databases of workers' compensation insurance

information, including financial, premium, and claim information collected pursuant to insurers'

data-reporting requirements.  *See* 211 CMR 110.00.  Loss history for a particular policyholder is

among the data required to be reported by the insurer to NCCI and/or the WCRIB in the form of

"unit statistical reports."   In certain circumstances, NCCI's and the WCRIB's reporting manuals

require insurers to report any third-party reimbursement for losses incurred under workers'

compensation insurance policies previously in effect in the form of corrected unit statistical

reports.

### B.     Factual Background

#### 1.     The Parties

AIG is a Delaware holding corporation for subsidiaries and affiliates that underwrite

various types of insurance; its principal place of business is in New York.  Chartis is also a

Delaware holding corporation with its principal place of business in New York.  AHAC is a

subsidiary of AIG and Chartis that underwrites commercial liability and workers' compensation

insurance; it is a New York corporation with a principal place of business in New York.  It is

also licensed to transact business in the Commonwealth of Massachusetts.

Composite Company, Inc. is a Massachusetts corporation with a principal place of

business in Massachusetts.  It obtained a workers' compensation insurance policy in 2005 that

was issued by defendant AHAC.  (Compl. ¶¶ 1, 20).  The policy covered the period from August 2, 2005, to August 2, 2006.  (Def. Mot. Dismiss 3 n.3; Pl. Opp. at 3).

### 2. Claims at Issue in This Dispute

The complaint asserts claims against all three defendants for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and violation of Mass. Gen. Laws ch. 93A.  The central allegation of the complaint is that defendants failed to revise the data they submitted to the WCRIB concerning the amount of reimbursement received from responsible third parties, resulting in the failure to issue a premium reimbursement and the incorrect calculation of future premiums.  (Compl. ¶¶ 24, 27).

Specifically, the complaint alleges that a lawsuit regarding an injury sustained on June 29, 2006, involved a settlement payment to AIG from responsible third parties in the amount $20,000.  (Compl. ¶¶ 23-24).  According to the complaint, if defendants had revised the data they submitted to WCRIB in 2008 to reflect that reimbursement, Composite would have been entitled to a $1,200 premium reimbursement and lower premiums going forward.  (Compl. ¶¶ 27-28).  The complaint further alleges that other similarly situated companies that had workers' compensation insurance policies underwritten by AIG subsidiaries suffered from the same improper treatment and that defendants persist in their failure to properly revise data submitted to the WCRIB and NCCI.  (*See* Compl. ¶¶ 28-30).

Composite alleges that its policy with AHAC states as follows:

> All premiums for this policy will be determined by our manuals of rules, rates, rating plans and classifications. We may change our manuals and apply the changes to this policy if authorized by law or governmental agency regulating this insurance. . . .
> The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that

lawfully apply to the business and work covered by the policy.

(*Id.* at ¶ 37).

Composite further alleges that defendants breached these provisions by failing to revise a unit statistical report they submitted to the WCRIB in 2008 and to adjust reserves to reflect a third-party recovery for a claim made by Composite and paid under the policy. (*Id.* at ¶¶ 21-26, 50). According to Composite, this alleged failure resulted in the application of an allegedly inflated experience modifier to a subsequently-issued workers' compensation policy with an effective date in 2008, artificially inflating the premium due under the 2008 policy and depriving Composite of a $1,200 premium reimbursement. (*Id.* at ¶ 27). Those allegations also undergird the claims for breach of the implied covenant, unjust enrichment, and Chapter 93A. (*Id.* at ¶¶ 54-72).

### 3. AIG and Chartis

As noted, the policy at issue was issued by AHAC. The complaint alleges that AIG and its insurance subsidiaries, including Chartis and AHAC, operate as a "unified entity" for the purpose of administering property and casualty insurance policies. (*See* Compl. ¶¶ 31-35). It further alleges that "AIG, Chartis, [AHAC], and other unnamed subsidiary insurance companies of Chartis were under common control and centralized operations," and that "[c]ontracts for workers compensation insurance entered into under the name of an AIG and/or Chartis subsidiary were entered into by, and on behalf of[,] AIG, Chartis, and its subsidiaries and in furtherance of the property casualty business of AIG." (*Id.* at ¶ 33). According to the complaint, "responsibility for all reporting and revising of data to NCCI and/or WCRIB, including unit statistical reports, was held by a single unit owned by AIG," and "[d]ecisions regarding reporting

and revising of data to NCCI and/or WCRIB were made by the same entity and applicable to all AIG subsidiaries." (*Id.* at ¶ 34).

### C.   Procedural Background

On January 24, 2013, Composite filed this suit against AHAC, Chartis, and AIG in Massachusetts Superior Court on behalf of itself and other similarly situated companies. On March 5, defendants removed the case to this Court on the basis of diversity of citizenship. *See* 28 U.S.C. §§ 1332(d), 1441(b).

Defendants Chartis and AIG have moved to dismiss the claims against them for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2). Defendant AHAC has moved to dismiss the complaint for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6) and to strike plaintiff's claim for exemplary damages under Fed. R. Civ. P. 12(f). Plaintiff Composite has moved to remand the case to state court.

## II.   Analysis

### A.   Personal Jurisdiction

The plaintiff bears the burden of showing that a court has personal jurisdiction over a defendant. *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 50 (1st Cir. 2002). A district court faced with a motion to dismiss under Rule 12(b)(2) may choose among several methods for determining whether the plaintiff has met its burden: the "*prima facie*" standard, the "preponderance-of-the-evidence" standard, or the "likelihood" standard. *Id.* at 50-51; *Foster-Miller, Inc., v. Babcock & Wilcox Can.*, 46 F.3d 138, 145-47 (1st Cir. 1995); *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675-78 (1st Cir. 1992).

Where, as here, a district court considers a motion to dismiss for lack of personal

jurisdiction without first holding an evidentiary hearing, the *prima facie* standard governs its

determination.  *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001).  This

standard is the "most conventional" of the methods for determining personal jurisdiction.

*Daynard*, 290 F.3d at 51 (quoting *Foster-Miller*, 46 F.3d at 145).  In conducting a *prima facie*

analysis, the court is required to take specific facts affirmatively alleged by the plaintiff as true

(whether or not disputed), construing them in the light most favorable to the plaintiff; the court,

however, should not credit "conclusory allegations or draw farfetched inferences."

*Ticketmaster-New York v. Alioto*, 26 F.3d 201, 203 (1st Cir. 1994).   The court can "add to the

mix [any] facts put forward by the defendants, to the extent that they are uncontradicted."

*Daynard*, 290 F.3d at 51.  Although the court will construe the facts in the light most favorable

to the plaintiff in a motion to dismiss, the plaintiff still has the burden of demonstrating each

jurisdictional requirement.  *See Swiss Am. Bank*, 274 F.3d at 618.

The exercise of personal jurisdiction over a defendant must be both authorized by statute

and consistent with the due process requirements of the United States Constitution.  *See, e.g.*,

*Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708, 712 (1st Cir. 1996); *Intech, Inc. v. Triple "C"*

*Marine Salvage, Inc.*, 444 Mass. 122, 125 (2005); *Good Hope Indus., Inc. v. Ryder Scott, Co.*,

378 Mass. 1, 5-6 (1979).  Furthermore,

> A district court may exercise authority over a defendant by virtue of either
> general or specific jurisdiction.  Specific jurisdiction exists when there is a
> demonstrable nexus between a plaintiff's claims and a defendant's forum-based
> activities.  General jurisdiction exists when the litigation is not directly founded
> on the defendant's forum-based contacts, but the defendant has nevertheless
> engaged in continuous and systematic activity, unrelated to the suit, in the forum
> state.

*Swiss Am. Bank*, 274 F.3d at 618 (citations and quotations omitted).

Although the complaint does not specifically allege whether this Court's jurisdiction over the defendant is specific, general, or both, plaintiff's briefing makes clear that it is advancing a theory of specific jurisdiction.

In Massachusetts, a federal court can assert specific personal jurisdiction over an out-of-state defendant in a diversity case only if the Massachusetts long-arm statute so allows and the exercise of jurisdiction is consistent with the due process requirements of the United States Constitution.  *U.S.S. Yachts, Inc. v. Ocean Yachts, Inc.*, 894 F. 2d 9, 11 (1st Cir. 1990).  The Massachusetts Supreme Judicial Court has consistently interpreted the long-arm statute to extend to the limits allowed by the United States Constitution.  *See "Automatic" Sprinkler Corp. of Am. v. Seneca Foods Corp.*, 361 Mass. 441, 443 (1972); *accord Tatro v. Manor Care, Inc.*, 416 Mass. 763, 771 (1994).  Thus, the First Circuit has held that a district court "may sidestep the [long-arm statute] inquiry and proceed directly to the constitutional analysis."  *Evans Cabinet Corp. v. Kitchen Int'l, Inc.*, 593 F. 3d 135, 146 (1st Cir. 2010).

This Court may exercise personal jurisdiction consistent with the Due Process clause only if it finds that defendant has maintained "minimum contacts" with the state "such that maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

The minimum-contacts analysis has three steps—relatedness, purposeful availment, and reasonableness:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities.  Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable.  Third, the exercise of jurisdiction must, in light of the Gestalt factors, be

reasonable.

*Adelson v. Hananel*, 510 F.3d 43, 49 (1st Cir. 2007) (citing *Daynard*, 290 F.3d at 60).  The

"gestalt" factors address the fairness of subjecting the defendant to the court's jurisdiction by

analyzing:

> (1) the defendant's burden of appearing in the forum;
> (2) the forum state's interest in adjudicating th[e] dispute;
> (3) the plaintiff's interest in obtaining convenient and effective relief;
> (4) the judicial system's interest in obtaining the most effective resolution to th[e] controversy; and
> (5) the common interest of all sovereigns in promoting substantive due process.

*Evans Cabinet Corp.*, 593 F.3d at 146.

### 1.    Relatedness

This case involves claims based upon the Massachusetts law of contracts, as well as

equitable claims related to defendants' conduct in connection with the insurance contract at

issue. For contract claims, the relatedness inquiry focuses on whether the forum-based activities

were instrumental to the formation, or breach, of the contract.  *Phillips Exeter Acad. v. Howard*

*Phillips Fund, Inc.*, 196 F.3d 284, 289 (1st Cir. 1999) (directing courts to "ask whether the

defendant's contacts with the forum were instrumental either in the formation of the contract *or*

*in its breach*") (emphasis added); *Massachusetts Sch. of Law v. ABA*, 142 F.3d 26, 35 (1st Cir.

1998).  In order to establish "the degree and type of contacts the defendant had with the forum,

apart from the contract alone," the court may examine "all of the communications and

transactions between the parties, before, during, and after the consummation of the contract."

*M-R Logistics, LLC v. Riverside Rail, LLC*, 537 F. Supp. 2d 269, 278 (D. Mass. 2008)" (citing

*Ganis Corp. of Cal. v. Jackson*, 822 F.2d 194, 198 (1st Cir. 1987)).

AIG and Chartis contend that they are merely holding companies, and do not have

relevant contacts with Massachusetts.  They assert that they are not licensed to do business in Massachusetts and own no property in Massachusetts.  More specifically, they contend that they do not write or issue insurance policies, either in Massachusetts or elsewhere, and therefore did not write or issue the policy at issue here, and that they do not report claims to the WCRIB or NCCI.

Plaintiffs contend that AIG manages its business by product line, not by individual company, citing to AIG's annual report for 2007.  It states, for example, that AHAC does not have a website for policy holders to submit claims, ask questions, or discuss premium calculation, and that instead insureds of AHAC are directed to an AIG-operated service when they make such inquiries.  It also contends that the telephone number for AHAC, as listed with the Massachusetts Division of Insurance, is an AIG automated voice service.

In addition, plaintiff contends that Chartis collects premiums for AHAC and other AIG subsidiary insurers, makes payments when appropriate to the insureds of the subsidiaries, pursues third-party recoveries for those subsidiaries, and conducts audits of insureds.  Plaintiff describes that its workers' compensation policies in years subsequent to 2005-2006 were issued in the name of National Union Fire Insurance Company of Pittsburgh, also a subsidiary of AIG and Chartis, and that Chartis, not NUFIC, contacted it concerning the alleged premium overcharges in dispute here.

Further, plaintiff alleges that defendants solicited business in Massachusetts.  It contends that AHAC conducts no advertising, that all advertising efforts are done in the name of AIG, including on its website, and that the resulting business is "funneled" to subsidiaries who then issue the actual policies.

Finally, plaintiff contends that AIG and Chartis lease office space at 100 Summer Street, Boston, Massachusetts.  (Pl. Opp. 9-10).[1]

In short, plaintiff has alleged that defendants AIG and Chartis, together with AHAC, essentially operate as an integrated business, and that AIG and Chartis participated in forming and administering the insurance policies at issue, which involved various contacts with Massachusetts.

Accordingly, taking the allegations of the complaint as true and considering the sum total of relations between plaintiff and defendants, defendants Chartis and AIG had contacts with Massachusetts that were sufficiently related to the claims at issue here to support the Court's exercise of personal jurisdiction over them.

### 2.    Purposeful Availment

"[P]urposeful availment involves both voluntariness and foreseeability."  *Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 28 (1st Cir. 2008).  Because defendants voluntarily participated in administering the insurance policy held by plaintiff to protect it from risk of worker's compensation claims related to injuries in Massachusetts, defendants should have reasonably anticipated being haled into court in Massachusetts to address any issues with that insurance, "making the defendant's involuntary presence before the state's courts foreseeable."  *Daynard*, 290 F.3d at 62 (quoting *Foster-Miller*, 46 F.3d at 144).  Again, in contract cases, it is well established that courts "look to and draw inferences from 'the parties' . . . actual course of dealing.'"  *Adelson,* 510 F.3d at 49 (quoting *Daynard*, 290 F.3d at 52 (quoting *Burger King*, 471

---

[1] AIG has provided an affidavit of the Vice President and General Counsel of American Insurance Realty Corp., which states that AIG subsidiary NUFIC leases office space at 99 High Street, Boston, Massachusetts, a very small portion of which is allocated to AIG as "dead space."  (Sailer Aff. at ¶ 5).  The affidavit also indicates that the lessee of the space at 100 Summer Street is AIG subsidiary Lexington Insurance Company.  (*Id.* at ¶ 6).

U.S. at 479)).

Here, defendants Chartis and AIG were not the named insurers on the policy at issue. Nonetheless, according to the allegations of the complaint, they were the entities who actually administered it.  Plaintiff corresponded with defendants Chartis and AIG when purchasing the policy, making claims under the policy, and paying premiums.  The allegations of the complaint also indicate that defendant AIG was the entity responsible for reporting data to the WCRIB in Massachusetts.  Defendant AIG also concedes that its subsidiary leases space at 99 High Street, Boston, Massachusetts, at least a portion of which is allocated to AIG itself, though it is unclear whether that space serves any functional purpose for AIG.

Defendants' alleged contacts with the forum here were not simply "in the nature of affirming a contract and making payments through the mail," which the Supreme Judicial Court found to be insufficient to confer personal jurisdiction in *"Automatic" Sprinkler Corp. v. Seneca Foods Corp.*, 361 Mass. 441, 446 (1972).  In that case, defendant's contacts in Massachusetts simply consisted of "the signing of the purchase order and the mailing of it by the defendant's agent from Dundee, New York, to Worcester, Massachusetts, the receipt by the defendant of the plaintiff's invoice mailed from the Worcester division, the receipt by the defendant of a letter from the plaintiff's Worcester division acknowledging and accepting the defendant's purchase order, and the defendant's payment by mail to the plaintiff's Worcester division."  361 Mass. at 444.  That decision was consistent with "a special concern for formulating a jurisdictional rule that would protect wholly passive purchasers, who do no more than place an order with an out of state merchant and await delivery." *Bond Leather Co. v. Q.T. Shoe Mfg. Co.*, 764 F.2d 928, 933 (1st Cir. 1985).  Here, however, the transaction at issue involves the provision of services, not

simply the shipment of goods.  Plaintiff alleges that AIG and Chartis were the entities that provided at least a large portion of the services required under the insurance contract. Accordingly, taking the allegations of the complaint as true, defendants Chartis and AIG purposefully availed themselves of doing business in Massachusetts.

### 3. Reasonableness

Even if the requisite contacts exist, the court's exercise of jurisdiction must "comport with fair play and substantial justice."  *U.S.S. Yachts*, 894 F.2d at 11.  The Supreme Court has identified five "gestalt factors" which bear upon the fairness of subjecting nonresidents to this Court's jurisdiction.  *Sawtelle*, 70 F.3d at 1394.  These factors are:  (1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies.  *Id*. (citing *Burger King v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

Here, the majority of these factors counsel in favor of exercising jurisdiction over the defendants.  First, defendants AIG and Chartis are large multinational corporations that would not be overly burdened if required to travel from their headquarters in New York to appear before this Court in Boston.  Also, defendant AHAC, which is undoubtedly subject to this Court's jurisdiction, is represented by the same counsel as defendants AIG and Chartis.  Second, to the extent practicable, plaintiff's best option for convenient and efficient resolution of this matter is to have all three defendants present in the same forum.  If defendants AIG and Chartis are dismissed, plaintiff will have to commence parallel litigation in another forum, presumably

New York.  Finally, the justice system has a similar interest in the efficient resolution of this matter.  Thus, exerting personal jurisdiction over defendants AIG and Chartis would be constitutionally reasonable.

Whether plaintiff can prove that AIG and Chartis are liable for any of plaintiff's claims is, of course, a question for another day.  Nonetheless, there is a sufficient basis for the assertion of personal jurisdiction.  The exercise of jurisdiction over AIG and Chartis comports with the due process requirements of the Constitution, and thus with the Massachusetts long-arm statute. Defendants' motion to dismiss for lack of personal jurisdiction will be denied.

### B.      Motion to Remand

Under 28 U.S.C. § 1441(a), "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants."  Under 28 U.S.C. § 1453, "a class action may be removed to a district court of the United States in accordance with section 1446 . . . without regard to whether any defendant is a citizen of the state in which the action is brought."  Because no federal question is present in this case, this Court has jurisdiction, if at all, pursuant to 28 U.S.C. § 1332(d), also called the Class Action Fairness Act ("CAFA"), which confers federal diversity jurisdiction over a class action when:  (1) at least one class member is diverse from at least one defendant; (2) there are at least 100 members in the class; and (3) the claims of all proposed class members, aggregated, exceed $5 million.

Plaintiff has moved to remand this case to state court on the ground that it does not satisfy the amount-in-controversy requirement.  When the amount in controversy is disputed in a CAFA removal case, defendants have the burden of demonstrating a "reasonable probability"

that the aggregate claims of the plaintiff class were greater than $5 million at the time of

removal. *Amoche v. Guar. Trust Life Ins. Co.*, 556 F.3d 41, 49, 51 (1st Cir. 2009).  Under the

"reasonable probability" standard, defendants must establish that it is more likely than not that

the amount in controversy exceeds the jurisdictional amount.  *See Manson v. GMAC Mortgage,*

*LLC*, 602 F. Supp. 2d 289, 293 n.9 (D. Mass. 2009) (stating that defendant's burden is "not an

onerous one").  Defendants can satisfy their burden by "relying on the face of the complaint in

the underlying case," by alleging facts in its notice of removal to support its amount in

controversy allegation, or by submitting "summary-judgment type evidence."  *Mut. Real Estate*

*Holdings, LLC v. Houston Cas. Co.*, 2010 WL 3608043, at *4 (D.N.H. 2010) (internal quotation

marks omitted).  Furthermore, "a court considering the amount in controversy need not view the

evidence solely in the light most favorable to the plaintiffs; rather, the court may review the

evidence in the record presented by both sides."   *Manson*, 602 F. Supp. 2d at 293 n.9.

Defendants point to the existence of another action filed in South Carolina on March 26,

2012, asserting similar claims predicated upon similar alleged conduct that contains an explicit

amount-in-controversy estimate exceeding $5 million.  *See Thrift Development Corporation v.*

*American International Group, Inc.*, *et al.*, No. 12-cv-861-MGL (D.S.C.).  Indeed, the complaint

here is nearly identical to the one in that action, which was filed by the same counsel against the

same defendants.  The major substantive difference between the complaints is that the *Thrift*

complaint expressly alleges that the United States District Court for the District of South

Carolina has jurisdiction over that action pursuant to CAFA.

In deciding whether there is federal jurisdiction over a matter, CAFA explicitly permits

courts to consider "whether, during the 3-year period preceding the filing of that class action, 1

or more other class actions asserting the same or similar claims on behalf of the same or other persons have been filed."  28 U.S.C. § 1332(d)(3)(F).  Indeed, courts in other circuits have found that removing defendants had met their burden of proving that the amount in controversy exceeded jurisdictional threshold by showing that many of same plaintiffs had pleaded damages of up to $5 million in other forums for same injuries.  *See, e.g., De Aguilar v. Boeing Co.*, 11 F.3d 55, 58 (5th Cir. 1993); *Temploy, Inc. v. Nat'l Council on Compensation Ins., Inc.*, 2009 WL 1097807, at *4-5 (S.D. Ala. 2009) (evidence that same plaintiff sought more than $6 million in a different action with the same claims and facts "constitute[s] sufficient non-speculative evidence as to the jurisdictional amount in controversy such that neither divination nor star gazing is required"); *Chopin v. World Rio Corp.*, 1995 WL 258266, at *3 (E.D. La. 1995) (holding that where plaintiffs "asserting identical injuries in actions in other jurisdictions have pled damages well in excess of [the amount in controversy threshold]," defendant demonstrated by a preponderance of the evidence that the amount in controversy threshold was met).  The Court will adopt that approach and consider such evidence relevant here.

The complaint here has only two significant differences from the complaint in *Thrift*. The first is that the *Thrift* complaint specifically alleges that there is federal jurisdiction over the matter pursuant to CAFA.  Second, the complaint here includes an additional cause of action for violation of Mass. Gen. Laws ch. 93A, and seeks treble damages in conjunction with that claim. Other than those differences, the complaints contain the same substantive allegations brought on behalf of classes of policyholders insured by defendants that had a workers' compensation claim filed in the state in which the action is pending, "for which a subsequent recovery was made from a responsible third party which was not properly reported by defendants" to the designated

16

rating agency.  Furthermore, census data suggests that the putative class is likely to be larger in

Massachusetts than in South Carolina.[2]  Based on those points of comparison, the Court finds

that defendants have met their burden of demonstrating a reasonable probability that the

aggregate claims of the plaintiff class were greater than $5 million at the time of removal.

Accordingly, plaintiff's motion to remand will be denied.

### C.      Motion to Dismiss for Failure to State a Claim

Defendant AHAC has moved to dismiss the complaint pursuant to Fed. R. Civ. P.

12(b)(6) for failure to state a claim upon which relief can be granted.  On a motion to dismiss,

the Court "must assume the truth of all well-plead[ed] facts and give plaintiff the benefit of all

reasonable inferences therefrom."  *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st

Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).  To survive a motion to

dismiss, the plaintiff must state a claim that is plausible on its face.  *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007).  That is, "[f]actual allegations must be enough to raise a right to relief

above the speculative level, . . . on the assumption that all the allegations in the complaint are

true (even if doubtful in fact)."  *Id.* at 555 (citations omitted).  "The plausibility standard is not

akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant

has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S.

at 556.  Dismissal is appropriate if plaintiff's well-pleaded facts do not "possess enough heft to

---

[2]According to United States Census data, South Carolina has a total population of 4.6 million, and is home
to 360,397 companies.  Massachusetts, on the other hand, has a total population of 6.5 million, and is home to
596,790 companies.  Therefore, Massachusetts not only has nearly two million more citizens than South Carolina,
but also—material to the volume of workers' compensation claims—Massachusetts has more than 236,000 more
businesses than South Carolina.   Reports published by the respective departments of insurance indicate that the
overall dollar amount of workers' compensation premium written in Massachusetts is greater than the amount
written in South Carolina.

show that plaintiff is entitled to relief." *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (quotations and original alterations omitted).

AHAC first contends that the doctrine of primary jurisdiction and the filed-rate doctrine both procedurally bar this Court from adjudicating plaintiff's claims.  As to the substance of the claims, AHAC contends that the terms of the 2005-2006 policy at issue did not govern its reporting in other years, and therefore cannot support claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of Chapter 93A.  AHAC also contends that the unjust enrichment claim must fail because plaintiff has adequate remedies at law.

### 1.     Doctrine of Primary Jurisdiction

The doctrine of primary jurisdiction is similar to the doctrine of exhaustion of administrative remedies in that, in certain circumstances, it precludes a federal court from adjudicating a dispute before a state or federal agency makes a final ruling on it.[3]  "Primary jurisdiction requires prior resort to an administrative agency 'where that procedure would secure 'uniformity and consistency in the regulation of business entrusted to a particular agency,' or 'when the issue involves technical questions of fact uniquely within the expertise and experience of an agency.'"  *Casey v. Massachusetts Elec. Co.*, 392 Mass. 876, 879 (1984) (quoting *Nader v. Allegheny Airlines*, 426 U.S. 290, 303-304 (1976)).  The SJC has noted that "the doctrine is particularly applicable when an action raises a question of the validity of an agency practice."

---

[3] "The doctrine of exhaustion of administrative remedies contemplates a situation where some administrative action has begun, but has not yet been completed; where there is no administrative proceeding under way, the exhaustion doctrine has no application. In contrast, primary jurisdiction situations arise in cases where a plaintiff, in the absence of pending administrative proceedings, invokes the original jurisdiction of a court to decide the merits of a controversy."  *Murphy v. Administrator of Div. of Personnel Administration*, 377 Mass. 217, 220 (1979).

*Murphy*, 377 Mass. at 221.  The doctrine of primary jurisdiction "does not apply, however, when the issue in controversy turns on questions of law [that] have not been committed to agency discretion."  *Id.*  Ultimately, "[t]he use of the doctrine in a particular case, the Court notes, rests in the sound discretion of the trial judge."  *Dolan v. Utica Mut. Ins. Co.*, 630 F. Supp. 305, 308 (D. Mass. 1986).

Here, defendant contends that the allegations of the complaint involve technical questions of fact uniquely within the expertise of the DOI, and, therefore, plaintiff was required first to avail itself of any administrative remedy available.  *See Liab. Investigative Fund Effort, Inc. v. Med. Malpractice Joint Underwriting Ass'n of Mass.*, 409 Mass. 734, 750-51 (1991).  Defendant further contends that Mass. Gen. Laws ch. 152, § 52D provides a dispute resolution process that would have provided plaintiffs with an administrative remedy.[4]

The primary flaw in defendant's position is that breach-of-contract claims, such as the claim advanced in this case, are not normally within the jurisdiction of an administrative agency to adjudicate.  *See Dolan*, 630 F. Supp. at 308 ("Breach of contract claims clearly do not lie within the expertise of the Commissioner of Insurance."); *see also Liability Investigative Fund Effort v. Medical Malpractice Joint Underwriting Ass'n*, 409 Mass. 734, 745 (1991) ("A party

---

[4] The statute provides as follows:

Any member of or subscriber to a rating organization may appeal to the commissioner from the action or decision of such rating organization in approving or rejecting any proposed change in or addition to the filings of such rating organization and the commissioner shall, after a hearing held upon not less than ten days' written notice to the appellant and to such rating organization, issue an order approving the action or decision of such rating organization or directing it to give further consideration to such proposal, or, if such appeal is from the action or decision of the rating organization in rejecting a proposed addition to its filings, he may, in the event he finds that such action or decision was unreasonable, issue an order directing the rating organization to make an addition to its filings, on behalf of its members and subscribers, in a manner consistent with his findings, within a reasonable time after the issuance of such order. In deciding such appeal the commissioner of insurance shall apply the standards set forth in section fifty-two.

Mass. Gen. Laws ch. 152, § 52D.

also may bring common law contract claims or claims based on G. L. c. 93A in a judicial rather than administrative forum if the agency involved does not have jurisdiction to hear those claims.").  Furthermore, it is by no means clear that the dispute resolution process outlined in Mass. Gen. Laws ch. 152, § 52D would even apply to plaintiff's allegations of improper reporting, let alone provide an adequate and complete remedy.

Under the circumstances, the doctrine of primary jurisdiction does not bar plaintiff from pursuing its claims in this forum.  Accordingly, the motion to dismiss on that ground will be denied.

### 2.      Filed Rate Doctrine

Defendant next contends that the filed rate doctrine operates as a bar to adjudication of this dispute in this Court.  As a general matter, the filed rate doctrine prohibits a court from adjudicating a dispute about the appropriateness of a rate that is filed and approved by an administrative agency.  *See Town of Norwood v. New Eng. Power Co.*, 23 F. Supp. 2d 109, 116 (D. Mass. 1998).  The doctrine is applied "out of deference to a congressional scheme of uniform regulation in order to avoid impermissibly usurping a function that Congress has assigned to a federal regulatory body."  *Id.* (internal quotation marks omitted).

Plaintiff responds by first contending that the filed rate doctrine is a federal doctrine that does not apply to rates filed with state agencies.  However, the case plaintiff cites for that proposition, *Norwood*, never explicitly so holds.  As in most cases where the filed rate doctrine is invoked, the court in *Norwood* was confronted with utility rates set by federal agencies, and thus made reference to congressional policy and federal regulatory authority.  *See id.* at 115-16. The court did not consider the issue of whether the doctrine applies when rates are set by state

agencies.  Although it is difficult to discern why the regulatory authority of state agencies, vested in them by state legislatures, does not also deserve the deference afforded federal agencies by the filed rate doctrine, the Court need not decide that issue here.  For the purposes of this motion, the Court will assume that the filed rate doctrine applies with equal force to rates set by state agencies.

The real issue is that the experience-modifier at issue in this case is not a filed rate.  The experience-modifier is a component of the rate calculated by the WCRIB.  It is a calculated figure based solely on data submitted by the insurers themselves.  The complaint alleges that defendants improperly failed to revise those data submissions, resulting in plaintiffs being charged an inflated rate for worker's compensation insurance.  As the Ninth Circuit has explicitly articulated, "the act of filing does not legitimize a rate arrived at by improper action." *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386, 394 (9th Cir. 1992).  Here, the complaint alleges that the actions of the defendant caused the injury.  The state and federal agencies involved had no control over the data submitted to them by insurers for the purposes of calculating rates.  *Id.* ("[I]f those rates were the product of unlawful activity prior to their being filed and were not subjected to meaningful review by the state, then the fact that they were filed does not render them immune from challenge.").

Furthermore, the Eighth Circuit has held that "the focus for determining whether the filed rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations."  *H.J., Inc. v. Northwestern Bell Tel. Co.*, 954 F.2d 485, 489 (8th Cir. 1992).  Here, agency procedures and rate calculations are not at issue.  What is at issue is the defendants' conduct with regards to the data they supplied to the rate-setting agencies.  A

decision in favor of plaintiff would not discredit any decision of an administrative agency.

Because the experience-modifier and the underlying data submissions are not in themselves "filed rates" and any decision in this case will not affect agency procedures, the filed rate doctrine does not operate as a bar to adjudication here.  Accordingly, the motion to dismiss on that ground will be denied.

### 3.    Claim for Breach of Contract

Defendant next contends, in substance, that it did not breach the terms of the insurance contract as a matter of law.  Specifically, it contends that the 2005-2006 policy at issue governed only its conduct with respect to premiums set for that policy, not any subsequent policies. Plaintiff responds by contending that the policy specifically incorporated the NCCI and WCRIB manuals, which require the revision of unit statistical reports after a policy has expired.

The language from the 2005-2006 policy at issue reads as follows:

> [a]ll premiums for this policy will be determined by our manuals of rules, rates, rating plans, and classifications.  We may change our manuals and apply the changes to this policy if authorized by law or government agency regulating this insurance. . . .  The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and proper classifications and rates that lawfully apply to the business and work covered by the policy.

(Compl. ¶ 37; Pl. Opp. Ex. A).

Under Massachusetts law, the Court must liberally construe policy language in favor of the insured.  *Hazen Paper Co. v. United States Fidelity & Guar. Co.*, 407 Mass. 689, 700 (1990). The Court must also accept the allegations of the complaint as true.  Under that framework, the "manuals" referred to in the policy are either the NCCI and WCRIB manuals themselves or substantially similar ones published by the defendants that include the same requirements as to revising unit statistical reports.  The central question is thus whether the 2005-2006 policy

incorporates those requirements as they relate to the setting of premiums for subsequent policies.

The language of the policy is not ambiguous as to why the manuals are incorporated—the determination of rates "for this policy." Despite plaintiff's contentions, that language clearly confines the use of the manuals to the computation of rates for the 2005-2006 policy. Reading it to incorporate ongoing reporting and revision requirements as a contractual obligation would be more than simply interpreting the language in plaintiff's favor; it would be rewriting the contract. Contrary to plaintiff's contention, the fact that no contractual obligation exists does not mean that defendants are not otherwise held to strict reporting requirements; it does, however, mean that plaintiff cannot plead a breach-of-contract claim for not making revisions to unit statistical reports in later years based on the terms of its 2005-2006 policy. Accordingly, the breach-of-contract claim will be dismissed.

### 4. <u>Claim for Breach of Implied Covenant</u>

Every contract "is subject to an implied covenant of good faith and fair dealing." *Christensen v. Kingston School Committee*, 360 F. Supp. 2d 212, 226 (D. Mass. 2005) (citing *Anthony's Pier Four, Inc. v. HBC Assoc.*, 411 Mass. 451, 473, 583 N.E.2d 806 (1991)). The covenant provides that "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract." *Anthony's Pier Four*, 411 Mass. at 471-472. A cause of action exists when the conduct of one party "unduly frustrates or renders impossible the expected performance of the contract." *Shealey v. Fed. Ins. Co.*, 2012 U.S. Dist. LEXIS 147883, 10 (D. Mass. Oct. 15, 2012). Here, plaintiff contends that defendants had a duty under the contract to revise unit statistical reports and adjust reserves after receiving reimbursements and recoveries, and to do so timely and properly. (Compl. ¶ 26). However,

even accepting as true the allegation that defendants knowingly and intentionally failed to take those actions, that did not destroy plaintiff's enjoyment of the contractual benefits of the 2005-2006 policy.  Defendants' failure may have caused plaintiff to pay higher premiums under later insurance contracts, or contravened the mandates of the NCCI and WCRIB manuals, but it did not unduly impair the fulfillment of the contract at issue.  Accordingly, the motion to dismiss the claim for breach of the covenant of good faith and fair dealing will be granted.

### 5.     Chapter 93A Claim

Unlike a breach of contract or breach of implied covenant claim, Chapter 93A "provides a cause of action for unfair and deceptive practices and is not confined to the terms of the relevant contract."  *Shealey v. Fed. Ins. Co.*, 2012 U.S. Dist. LEXIS 147883, 10 (D. Mass. Oct. 15, 2012).  A Chapter 93A claim cannot be based solely on a breach of contract, without more.  *See, e.g.*, *Mead Corp. v. Stevens Cabinets, Inc.*, 938 F. Supp. 87, 90 (D. Mass. 1996).  Nor can it be based solely on a claim of a breach of the implied covenant of good faith, absent an allegation that the breach was undertaken to extract an extra-contractual benefit from the plaintiff.  *See, e.g.*, *Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc*., 754 F.2d 10, 17-19 (1st Cir. 1985) (contract payments withheld as "wedge against [plaintiff] to enhance [defendant's] bargaining power for more product" (internal quotations omitted)); *Anthony's Pier Four, Inc. v. HBC Assocs., Inc*., 411 Mass. 451, 474-75 (1991) (breach was pretext to coerce payment of more money than contract required).

Here, plaintiff's contentions go well beyond such bare claims.  The complaint includes the allegation that defendants have "consistently failed to properly report recoveries for its insured throughout the Commonwealth of Massachusetts."  (Compl. ¶ 29).  It further alleges that

this conduct is of an "ongoing and continuous nature . . . continuing to present day." (*Id.* at ¶ 30). The allegations of improper conduct in the complaint involve the reporting of and revision to data concerning a loss that occurred in the 2005-2006 policy year, the effect of which insureds would feel only in premiums for later years. Defendants offer insurance policies that span one-year terms but routinely are renewed from year to year, and thus could increase their own revenue by failing to revise unit statistical reports relating to the policies of prior years. According to the complaint, as a result of such improper conduct defendants have deprived their insured of premium reimbursements and have been able to profit improperly from settlements made with third parties regarding past claims. Such contentions are sufficient to state a claim for relief under Chapter 93A. Accordingly, and under the circumstances, defendant's motion to dismiss will be denied as to the Chapter 93A claims.

### 6.      Unjust Enrichment

Finally, defendant contends that the unjust enrichment claim must be dismissed because plaintiff has adequate remedies at law. Specifically, defendant contends that Chapter 93A and the administrative dispute resolution process of Mass. Gen. Laws ch. 152, § 52D could provide plaintiff with the relief sought.

Defendant's position is misguided. First, Chapter 93A provides an equitable, not a legal, remedy for unfair and deceptive business practices. *See* Mass. Gen. Laws ch. 93A, § 11. Second, an administrative dispute resolution process that does not provide for the recovery of monetary damages does not constitute an adequate remedy at law in this instance. Finally, as plaintiff correctly points out, unjust enrichment provides an alternative, equitable theory of recovery in the event that the Court finds that the contract did not govern the conduct at issue.

Accordingly, the motion to dismiss the unjust enrichment claim will be denied.

      **D.**      **Motion to Strike Exemplary Damages**

AHAC has also moved under Rule 12(f) to strike plaintiff's request for exemplary damages.  The complaint requests exemplary damages for "[i]ntentional, willful, wanton, and reckless disregard for the rights of the plaintiff and the proposed plaintiff class."  (Compl. at D). Mass. Gen. Laws ch. 93A provides for multiple damages in some circumstances; otherwise, however, Massachusetts law does not provide for exemplary or punitive damages for the claims alleged in the complaint.  The motion to strike will therefore be granted, except to the extent that the complaint alleges multiple damages for willful breach of chapter 93A.

**IV.**      **Conclusion**

For the foregoing reasons,

     (1)      the motion of AIG and Chartis to dismiss for lack of personal jurisdiction is DENIED;

     (2)      the motion of AHAC to dismiss for failure to state a claim is GRANTED as to the claims of breach of contract and breach of the implied covenant of good faith and fair dealing, and otherwise DENIED;

     (3)      the motion of AHAC to strike is DENIED as to the claims for multiple damages under Mass. Gen. Laws ch. 93A, and otherwise GRANTED; and

     (4)      plaintiff's motion to remand is DENIED.

**So Ordered.**

                                        /s/ F. Dennis Saylor_____
                                        F. Dennis Saylor IV

Dated: September 16, 2013                United States District Judge